## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAY M. LAYFIELD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-358-SLR-SRF |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff Jay M. Layfield ("Layfield" or "Plaintiff") filed this action against defendant Carolyn W. Colvin, Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") on May 5, 2015. (D.I. 1)  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision on November 12, 2013, by Administrative Law Judge ("ALJ") Judith A. Showalter, denying his claims for disability benefits ("DIB") under Title II.

Presently before the court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. (D.I. 8; D.I. 11)  Plaintiff asks the court to enter an award of benefits or, alternatively, to remand this case for further administrative proceedings. (D.I. 9 at 3)  The Commissioner requests that the court affirm the ALJ's decision. (D.I. 12 at 11)  For the reasons set forth below, I recommend that the court grant Plaintiff's motion for summary judgment and deny the Commissioner's cross-motion for summary judgment.

## II.   BACKGROUND

### A.   Procedural History

On May 18, 2009, Plaintiff filed a claim for DIB benefits,[1] originally alleging that he has

been disabled since April 30, 2003 due to diabetes, gastroparesis, high blood pressure, and

depression. (D.I. 4, Tr. at 248-51; 284-85)  Plaintiff subsequently amended the alleged onset

date to October 4, 2007. (Tr. at 39, 266)  On September 25, 2009, Plaintiff's claims for DIB

benefits were denied. (Tr. at 151-54)  Plaintiff submitted a request for reconsideration on

November 23, 2009, which was denied on December 23, 2009. (Tr. at 157; 159-163)  On

January 29, 2010, Plaintiff filed a written request for a hearing before an ALJ. (Tr. at 165)

A hearing was initially scheduled before the ALJ on October 7, 2010, but was

rescheduled to January 7, 2011. (Tr. at 36-87; 174)  On March 5, 2011, the ALJ issued a written

decision denying Plaintiff's claim for benefits. (Tr. at 122-135)  The Appeals Council granted

Plaintiff's request for review on September 20, 2012 and remanded Plaintiff's claim to the ALJ.

(Tr. at 136)  The ALJ held a remand hearing on October 23, 2013. (Tr. at 88-119)  On

November 12, 2013, the ALJ issued a written decision, again finding that Plaintiff was not

disabled and denying Plaintiff's claim for DIB. (Tr. at 19-29)  On December 3, 2013, Plaintiff

filed an appeal of the ALJ's opinion, which was denied by the Appeals Council on March 4,

2015, causing the November 12, 2013 decision to become final. (Tr. at 1-3; 14)

At issue in this case is Plaintiff's entitlement to an award of DIB benefits from October 4,

2007, the alleged onset date of disability, to September 30, 2008, the date he was last insured.

---

[1] Plaintiff also filed a claim for Supplemental Security Income ("SSI") on May 18, 2009.
Plaintiff's application for SSI was denied on May 25, 2009. (Tr. at 143-150)  Plaintiff did not
pursue his claim for SSI benefits after the initial denial.

## B.    Medical History[2]

Plaintiff, born in 1956, was fifty-one years old at his alleged onset date.  (Tr. at 129)

Plaintiff is considered a person closely approaching advanced age under 20 C.F.R. §

404.1563(d).  He has a high school education and past relevant work experience as a retail

laborer, office manager, cashier, and self-employed consultant.  (Tr. at 20)  Plaintiff alleges

disability due to diabetes, gastroparesis, high blood pressure, and depression.  (Tr. at 126)

### 1.    Diabetes Mellitus/Gastroparesis

Plaintiff began treating with primary care physician Jane Williams Moore, M.D., for

nausea and fatigue in February 2003.  (Tr. at 757-758)  Dr. Moore ordered Plaintiff to undergo

an abdominal sonogram, which revealed material in the gallbladder and a probable kidney stone,

as well as an abdominal MRI, which revealed no abnormalities.  (Tr. at 789-92)  She also

referred him to endocrinologist James M. Lenhard, M.D., who treated Plaintiff on March 21,

2003 and noted that his blood sugars were unstable and hard to control.  (Tr. at 860-61)

On March 25, 2003, Plaintiff was admitted to the emergency room for nausea, vomiting,

and abdominal pain and bleeding.  (Tr. at 395-97)  He underwent a CT scan and ultrasound of his

abdomen and pelvis, which revealed a gallstone in his gallbladder, mild splenomegaly, and a left

renal cyst, but no other abnormalities.  (Tr. at 856-58)  An upper endoscopy revealed gastritis

caused by his upper gastrointestinal bleeding.  (Tr. at 407-08; 858-59)  The gastrointestinal

bleeding stopped on its own, and he was discharged on March 31, 2003 with a prescription for

Reglan and instructions to follow up with Dr. Susan K. Jonas, a gastroenterologist, for a

gastrointestinal workup.  (Tr. at 397)  On April 7, 2003, Dr. Jonas treated Plaintiff for nausea,

---

[2] For purposes of the analysis, the relevant time period in this case is from the onset date of
October 4, 2007 to the date last insured of September 30, 2008.  For background purposes, this
summary of Plaintiff's medical history contains information predating his alleged onset date.

and advised him to treat with Dr. Lenhard to get his diabetes under control. (Tr. at 834) Dr. Jonas instructed Plaintiff on anti-reflux measures and ordered him to continue taking Reglan and Prilosec. (*Id.*) She planned to screen him for a colonoscopy once his platelets reached normal levels. (*Id.*)

On August 5, 2003, Plaintiff was admitted to the hospital for vomiting, and was diagnosed with diabetic ketoacidosis. (Tr. at 371-73) He underwent an endoscopy, which showed gastritis and distal esophagitis consistent with gastroesophageal reflux disease and gastroparesis. (Tr. at 378-79; 854-55) He also underwent a stomach biopsy, which confirmed the diagnosis of gastritis. (Tr. at 382; 784; 853) His abdominal ultrasound revealed sludge in his gallbladder, but no other abnormalities. (Tr. at 381; 852) He was discharged on August 8, 2003 with instructions to follow up with his treating physicians. (Tr. at 373-74)

On September 8, 2003, Plaintiff followed up with Dr. Moore, who noted that Phenergan had not helped Plaintiff's gastrointestinal symptoms, but he was feeling much better on Reglan. (Tr. at 749-50) On September 16, 2003, Plaintiff saw Dr. Jonas, who advised Plaintiff to keep tight control of his diabetes to alleviate his gastroparesis, and scheduled him to undergo a colonoscopy on November 10, 2003. (Tr. at 831) Plaintiff's colonoscopy revealed no abnormalities. (Tr. at 360; 770; 851)

Plaintiff continued to see Dr. Moore, who observed on October 26, 2004 that Plaintiff's gastrointestinal symptoms had worsened after about a year of being stabilized. (Tr. at 743-44) On April 20, 2005, Plaintiff was referred to the emergency room for acute gastroenteritis, dehydration, and diabetes mellitus that was not well-controlled at the time. (Tr. at 668-81; 739-40) Plaintiff followed up with Dr. Moore on April 28, 2005, who noted that his diabetic gastroparesis had been exacerbated by a stomach virus, and he was diagnosed with gallstones,

4

but his digestive symptoms were improving. (Tr. at 737-38)

On May 16, 2005, Plaintiff treated with Dr. Jonas for severe gastroparesis. (Tr. at 828) Radiological test results revealed that Plaintiff's gallbladder contained sludge or stones, but no other abnormalities. (Tr. at 848-50) Dr. Jonas advised Plaintiff to continue strict anti-reflux measures and to undergo an elective surgery to remove his gallbladder when his diabetes was under control. (Tr. at 829-30) On August 12, 2005, Plaintiff underwent laparoscopic surgery to remove his gallbladder in connection with treatment of his diabetes mellitus. (Tr. at 432-49; 780; 843-46) The surgery revealed chronic cholecystitis, or inflammation of the gallbladder, due to gallstones. (*Id.*) He was discharged on August 13, 2005. (Tr. at 432)

Plaintiff returned to the hospital on March 5, 2006 for gastrointestinal symptoms which were exacerbated by Plaintiff's consumption of greasy food. (Tr. at 535-42; 547-49) Plaintiff underwent an upper gastrointestinal endoscopy with biopsies on March 7, 2006, which revealed severe distal esophagitis from reflux disease. (Tr. at 543-44; 652-53; 841) He was discharged on March 8, 2006, with instructions to follow up with his treating physicians and comply with his medication regimen. (Tr. at 577-79)

On June 21, 2006, Plaintiff visited Dr. Moore, who observed that Plaintiff's diabetes was uncontrolled due to Plaintiff's failure to follow dietary restrictions, and Plaintiff requested something stronger than the Reglan and Phenergan for his nausea and vomiting. (Tr. at 735-36) Dr. Moore prescribed Zofran and Dilaudid. (Tr. at 736) On January 9, 2007, Plaintiff followed up with Dr. Moore, who noted that Plaintiff had failed to follow his dietary restrictions, and Plaintiff requested pain medication. (Tr. at 733) Dr. Moore recommended that Plaintiff visit the emergency room if his symptoms persist or worsen. (Tr. at 734) Plaintiff returned to the emergency room on January 10, 2007 with complaints of abdominal pain and vomiting. (Tr. at

522-24)  He was diagnosed with abdominal pain and gastritis and was instructed to continue his current medications prior to being discharged on the same day.  (*Id.*)

Dr. Jonas last treated Plaintiff in January 2007 for nausea, vomiting, and abdominal pain, which she partially attributed to his diet during the holidays.  (Tr. at 824-27)  Dr. Jonas observed that Plaintiff's Dilaudid prescription was likely exacerbating his gastroparesis, and noted his history of narcotic analgesic dependence.  (Tr. at 824)  Dr. Jonas concluded that Plaintiff's diabetes mellitus was out of control, which aggravated his gastroparesis, and it was unclear whether he was compliant with his treatment.  (Tr. at 826)  Dr. Jonas advised Plaintiff to contact Dr. Lenhard to get his diabetes under control, take various anti-reflux measures to ease his reflux symptoms, and avoid taking Dilaudid.  (*Id.*)  On January 22, 2007, Dr. Jonas performed an upper gastrointestinal endoscopy, esophageal brush, and biopsy.  (Tr. at 480-96; 515-16; 837-39)  The procedure confirmed that Plaintiff suffers from gastroesophageal reflux, and Dr. Jonas recommended that Plaintiff follow strict anti-reflux measures and continue his prescribed medications.  (Tr. at 839)

In April 2007, Plaintiff followed up with Dr. Moore and stated that his gastroparesis was under control, noting that he planned to travel to Jamaica for his wedding anniversary.  (Tr. at 729)  On October 24, 2007, Plaintiff saw Dr. Moore for treatment of his depression and diabetes.  (Tr. at 727-28)  During the visit, Plaintiff stated that he was applying for disability because he could no longer hold a job due to his gastroparesis.  (Tr. at 727)  On December 11, 2007, Plaintiff followed up with Dr. Moore for nausea and stomach pain resulting from Plaintiff's consumption of greasy food.  (Tr. at 725)  Dr. Moore refilled Plaintiff's Dilaudid prescription to treat his stomach pain, but cautioned him to use the narcotic sparingly and follow his dietary restrictions.  (Tr. at 725-26)

6

On February 29, 2008, Plaintiff treated with Dr. Moore, who noted that Plaintiff's diabetes was stable, his depression was well-controlled with Wellbutrin, and he experienced some vomiting resulting from his gastroparesis. (Tr. at 723-24) Dr. Moore recommended that he continue his current medications, remain hydrated, and maintain his diet carefully. (Tr. at 724) Plaintiff followed up with Dr. Moore regarding his gastroparesis on October 24, 2008, but reported no abdominal symptoms during the visit. (Tr. at 717) Dr. Moore noted that Plaintiff took Zofran occasionally to control his gastroparesis, but the condition was usually controlled with diet and Phenergan as needed. (*Id.*)

On December 18, 2009, Dr. Moore completed a diabetes mellitus residual functional capacity ("RFC") questionnaire, in which she opined that Plaintiff was incapable of maintaining a low stress job. (Tr. at 881-89) Dr. Moore indicated that Plaintiff was limited to about four hours of standing and four hours of sitting per day, and would require unscheduled breaks lasting approximately five minutes. (Tr. at 882-83) Dr. Moore stated that Plaintiff would experience severe nausea and vomiting, fatigue, shortness of breath, and hypoglycemic episodes which would affect his ability to work. (Tr. at 884)

Since May 2001, Plaintiff treated with Dr. M. James Lenhard, an endocrinologist, on a quarterly basis for his diabetes mellitus. (Tr. at 984) On February 16, 2007, Dr. Lenhard indicated that Plaintiff had good control of his diabetes, and his diabetic gastropathy was improving. (Tr. at 935) On June 13, 2008, Dr. Lenhard reported that Plaintiff had one episode of severe hypoglycemia, but the episode was explainable and there were no recurrences. (Tr. at 815) Dr. Lenhard suspected that Plaintiff suffered from glaucoma, but had no critical retinopathy related to his diabetes. (*Id.*) Dr. Lenhard completed a diabetes mellitus RFC questionnaire on December 23, 2010, in which he indicated that Plaintiff is capable of low stress

jobs and stated that Plaintiff has been disabled since at least September 30, 2008. (Tr. at 985-87)

On September 24, 2009, state agency medical consultant Gurcharan Singh performed a physical residual functional capacity assessment of Plaintiff. (Tr. at 863-69) Dr. Singh reviewed Plaintiff's medical history and concluded that Plaintiff could stand for at least two hours in an eight hour work day and sit for approximately six hours during an eight hour work day. (Tr. at 864; 869) He found no manipulative, visual, communicative, or environmental limitations. (Tr. at 866-67)

### 2. Depression

On April 8, 2003, Plaintiff treated with Dr. Moore, who noted that Plaintiff suffered from depression. (Tr. at 756) Plaintiff continued to complain of depression during his May 8, 2003 visit with Dr. Moore, who recommended that he begin taking Celexa again. (Tr. at 754) During Plaintiff's June 9, 2003 visit with Dr. Moore, Dr. Moore noted that Plaintiff did not get his Celexa prescription filled due to his insurance, but complained of having difficulty getting out of bed approximately two times per month due to his depression. (Tr. at 751) Dr. Moore prescribed Wellbutrin in lieu of Celexa. (Tr. at 752) On September 8, 2003, Dr. Moore reported that Plaintiff's depression improved with the Wellbutrin. (Tr. at 749-50) Dr. Moore reported that Plaintiff's depression was stable in December 2003. (Tr. at 748)

Plaintiff visited Dr. Moore multiple times between 2004 and 2007, but it was not until October 24, 2007, that Dr. Moore's medical records mentioned depression again. (Tr. at 727-742) Dr. Moore prescribed Wellbutrin and recommended that Plaintiff seek counseling.[3] (Tr. at

---

[3] Dr. Moore specifically recommended that Plaintiff seek counseling at Pathways, which specializes in drug rehabilitation. (Tr. at 728)

728) During Plaintiff's visit on February 29, 2008, Dr. Moore indicated that his depression was well-controlled with Wellbutrin. (Tr. at 723-24)

On September 25, 2009, state agency medical consultant Hillel Raclaw, Ph.D., completed a Psychiatric Review Technique for Plaintiff, concluding that Plaintiff had the symptoms, signs, and laboratory findings to substantiate Plaintiff's depressive disorder, which caused mild restrictions on his daily activities and his ability to maintain concentration, persistence and pace. (Tr. at 873; 878) Dr. Raclaw concluded that Plaintiff's depressive disorder was non-severe and well-controlled with his prescriptions. (Tr. at 880)

### 3. Coronary artery disease

Plaintiff has a history of coronary artery disease and underwent stenting in 2000 after experiencing a myocardial infarction. (Tr. at 483; 932; 958-60) On January 31, 2003, Plaintiff was admitted to the emergency room for chest pain, and subsequently treated with Dr. Gilbert A. Leidig, Jr., a cardiologist, who attributed his chest discomfort to physical exertion and recommended that Plaintiff continue his medications at home. (Tr. at 684-85; 699; 950) On April 16, 2003, Plaintiff followed up with Dr. Leidig, who indicated that Plaintiff was doing well from a cardiac standpoint but advised delaying his stress test to give him time to recover from his recent surgery. (Tr. at 948-49) He underwent a treadmill stress test and stress cardiolite test on October 6, 2003, which revealed no abnormalities. (Tr. at 946-47)

On November 5, 2004, Plaintiff saw Dr. Anthony W. Clay, D.O., a cardiologist who gave Plaintiff a treadmill stress test and a stress cardiolite test. (Tr. at 768-69) The tests revealed no abnormalities. (*Id.*) On November 19, 2004, Plaintiff saw Dr. Leidig, who noted that Plaintiff had no anginal chest discomfort or symptoms and was able to actively care for his grandchildren. (Tr. at 942-43) Dr. Leidig recommended that Plaintiff participate in more regimented exercise

9

for thirty minutes per day. (*Id.*) On August 3, 2005, Plaintiff saw Dr. Leidig for a preoperative clearance prior to undergoing a cholecystectomy to remove his gallbladder. (Tr. at 766; 939-41) Dr. Leidig stated that Plaintiff had not had any recurrent anginal symptoms. (Tr. at 767)

Plaintiff next saw Dr. Clay on February 24, 2006 for a treadmill stress test and a stress cardiolite test. (Tr. at 498-99; 764-65; 937-38) Dr. Clay noted that the treadmill stress test was terminated prematurely due to Plaintiff's shortness of breath, and stated that the test was non-diagnostic due to baseline ECG abnormalities but revealed no arrhythmias. (Tr. at 764) The stress cardiolite test revealed that both rest and stress images of the left ventricular myocardium were normal, and there was no evidence of exercise-induced ischemia. (Tr. at 765) On March 24, 2006, Plaintiff saw Dr. Leidig, who noted that Plaintiff was making good progress and counseled him on smoking cessation, advising him to follow up again in one year. (Tr. at 500-01; 762-63)

On April 23, 2007, Plaintiff followed up with Dr. Leidig, who noted that Plaintiff had been doing well and had not recently experienced any cardiac symptoms. (Tr. at 933-34) Dr. Leidig referred Plaintiff to Dr. Alan Micklin, M.D., a cardiologist, who performed an exercise stress cardiolite test and a carotid artery duplex ultrasound on July 6, 2007, as well as an abdominal aorta duplex ultrasound performed on July 17, 2007. (Tr. at 760-61) The exercise stress cardiolite test was cut short due to Plaintiff's fatigue, but revealed no evidence of ischemia or infarction. (Tr. at 761) The test results from the carotid artery duplex ultrasound were consistent with mild stenosis of the right internal carotid artery and minimal stenosis of the left internal carotid artery. (Tr. at 760) On June 3, 2008, Plaintiff saw Dr. Leidig, who indicated that Plaintiff was doing "extremely well," and advised him to walk at least five days per week and quit smoking. (Tr. at 818)

10

### C.  Administrative Hearing

#### 1.  Plaintiff's testimony

The ALJ held administrative hearings on January 7, 2011 and October 23, 2013. (Tr. at 36-119) Plaintiff appeared, represented by counsel. (*Id.*) Plaintiff was born on June 16, 1956, and was fifty-four years old at the time of the first hearing and fifty-seven years old at the time of the second hearing. (Tr. at 46; 95) Plaintiff lives with his wife, daughter, grandchild, and grandchild's stepfather. (Tr. at 47) He is able to drive but has some difficulty with vision at night. (*Id.*)

Plaintiff has not worked since April 2003. (Tr. at 52) From 1995 to 1999, Plaintiff worked for Software IQ, a company run by Plaintiff and his wife that offered computer software, training, and consulting. (Tr. at 51) Plaintiff handled scheduling and billing in this position. (*Id.*) From 1999 to 2003, Plaintiff worked for K-Mart as an assistant electronics manager, but was later transferred to a cashier position due to his inability to lift up to fifty pounds on a regular basis. (Tr. at 47-50) Plaintiff also worked for a non-profit organization called Community Systems from 2000 to 2001 as an office manager and assistant to the director. (Tr. at 50)

Plaintiff testified that his gastroparesis impedes his life, causing him to suffer from nausea and vomiting throughout the day. (Tr. at 53-54) During the relevant time period from 2007 to 2008, Plaintiff testified that he was being treated for gastroparesis by his primary care physician, Dr. Moore, and an endocrinologist, Dr. Lenhard, who attempted to regulate his medication to reduce his vomiting. (Tr. at 54) Plaintiff also suffered from diabetes and took two types of insulin in addition to the Reglan for his gastroparesis and anti-depressants. (Tr. at 54) Plaintiff's diabetes was made worse by his gastroparesis because he had difficulty controlling the

amount of food that would remain in his system. (Tr. at 101) When his blood sugar drops, Plaintiff experiences heart palpitations, sweating, loss of focus, and confusion. (Tr. at 102)

Plaintiff's visits to emergency rooms for dehydration stopped in 2007 following an increase in the dosage of his nausea medication and the introduction of Zofran. (Tr. at 56) However, Plaintiff testified that the gastroparesis prevents him from eating solid food more than three or four times a week, and he continues to suffer from nausea and vomiting. (Tr. at 57) He attributed his weight gain during that time period to his insulin medication. (*Id.*) Plaintiff has been advised to avoid certain foods to prevent aggravation of his gastroparesis, and also follows certain dietary restrictions due to his diabetes. (Tr. at 61-62)

Plaintiff has not undergone any procedures for his coronary artery disease since 2000, when he had a stent placement, but he visits a cardiologist biannually. (Tr. at 57-58) He testified that he did not experience any significant symptoms during the 2007-2008 time period and felt that his heart condition was the least of his problems. (Tr. at 58) Plaintiff continues to smoke about a half pack of cigarettes per day, despite efforts to quit including nicotine patches, lozenges, gum, Chantix, and Wellbutrin. (Tr. at 59)

Plaintiff also testified that he suffered from severe depression, but had never treated with a psychiatrist, psychologist, or therapist and was instead treated by his primary care physician. (Tr. at 62; 100-01) Plaintiff was unable to recall which medications he took to treat his depression during the relevant time period, but at the time of the January 7, 2011 hearing, he took Wellbutrin and Trazodone. (*Id.*) Plaintiff indicated that his depression causes him to experience suicidal thoughts and difficulty with concentration. (Tr. at 63)

According to Plaintiff, his medications made him dizzy and lethargic and reduced his ability to concentrate during the relevant time period. (Tr. at 65; 102) He becomes fatigued and

lightheaded after walking the equivalent of a city block, and such a walk would take him fifteen to twenty minutes to complete. (*Id.*) He cannot climb stairs and remains on the first floor of his residence. (Tr. at 66) During the relevant time period, Plaintiff could stand for an hour to an hour and a half at a time, had no limitations on sitting, and was capable of lifting about ten pounds. (Tr. at 66-67) Plaintiff had no limitations on bending forward at the waist, kneeling, stooping, or breathing. (Tr. at 69-70) He does not require assistance taking his own medications or maintaining his personal hygiene, and was capable of sleeping a total of eight hours at night in 2007-2008. (Tr. at 70-71) He began having difficulty preparing meals in 2007 due to his nausea. (Tr. at 71) He completed household chores including loading the dishwasher, carrying laundry, making the bed, and driving for simple errands. (Tr. at 72)

Plaintiff enjoys listening to music, but can no longer read books or travel extensively. (Tr. at 73-74) He occasionally visits with childhood friends in Pennsylvania. (Tr. at 74) He does not participate in any social clubs or groups. (Tr. at 75)

At the second hearing, Plaintiff stated that he could not perform his past work running a computer software, training, and consulting business during the relevant time period because he suffered from daily symptoms including nausea, vomiting, fatigue, difficulty concentrating, and severe muscle spasms in his stomach. (Tr. at 96-99) Plaintiff anticipated that he would miss work five to seven days a month, and would be unable to concentrate when he was at work. (Tr. at 103)

### 2.    Vocational expert's testimony

At the first hearing, the VE testified that, according to Plaintiff's testimony, Plaintiff had worked as an assistant electronics manager or store laborer, which is at a sedentary exertional level, skilled with a special vocational preparation ("SVP") of seven. (Tr. at 68) The VE noted

13

that Plaintiff also worked as a cashier, which is a light duty, unskilled job with an SVP level of two. (Tr. at 68-69) The VE stated that Plaintiff next worked as a self-employed consultant for a period of eight years, which is at a sedentary exertional level, skilled with an SVP of eight. (Tr. at 69)

The ALJ posed the following hypothetical to the VE:

This individual is approximately 51 years old, has a high school education, is able to read, and write, and do at least simple math such as adding and subtracting. There are certain underlying impairment's [sic] that place limitations on the ability to do work related activities. In this particular hypothetical the lifting is at a sedentary level of exertion, posturally, all the postural's are occasional, but this individual should avoid climbing a ladder, a rope, or a scaffold. This individual should avoid concentrated exposure to temperature extremes. Odors, dust, gases, poor ventilation. In your opinion, with this hypothetical, having talked earlier about the past relevant work, could such a person do any of the past relevant work, in your opinion?

(Tr. at 82) The VE responded: "[T]hey could perform the past work as the – as the consultant and then as the office manager as they are customarily performed or defined by Dictionary of Occupational Titles and it appears that that's the way he actually performed them." (Tr. at 83)

On cross-examination, Plaintiff's attorney asked whether a hypothetical individual who suffered from frequent interference with attention and concentration, the inability to perform low-stress jobs, sit/stand limitations, the need to take unscheduled five-minute breaks every two hours, the inability to lift, and the need to be absent from work more than four days per month would be capable of sedentary work. (Tr. at 84-85) The VE stated that a hypothetical individual with such limitations would be unable to perform any competitive work. (Tr. at 85)

At the second hearing on October 23, 2013, a different VE testified. The ALJ informed the VE about the previous hypothetical posed to the first VE. (Tr. at 107-108) The VE indicated that Plaintiff could perform past relevant work pursuant to the hypothetical, but noted that this would not be the case if Plaintiff were limited to simple, unskilled work. (Tr. at 108) Plaintiff's

14

attorney then asked the VE "For the – the self-employment position . . . If the person was doing

it on a part-time basis only and it wasn't a home setting, does – does that affect how they learn

the job, what skills they really gather from it, does that – does that play a role at all in what they

really, truly know from that type of a position?" (Tr. at 109) The VE responded:

> The office manager position that was described by the judge, with the SVP of 7,
> would basically also include jobs duties where the person would be supervising
> other staff and I believe that that was why she had mentioned that the SVP would
> be reduced. Because if the person is self-employed and they're not supervising
> other people, then obviously it would remove those job duties from the
> description. The other core job duties would be the same, so I would say that the
> SVP would be reduced to perhaps a five . . . . But the essential tasks of the job
> would still be the same.

(Tr. at 109) The VE further clarified that the skills acquired would depend on

> The length of time that the person did the job . . . if they were able to learn the job
> duties with the position that which would be skilled essentially, even with an SVP
> of 5. The person would need to do the job duties for the number of hours that
> someone would typically do the job at full-time in order to be able to acquire
> those skills. So basically what we would have to do is say okay, if the person did
> it for three years and it was 15 hours a week, how much time would that be if the
> person really would be working full-time.

(Tr. at 113-14) Next, Plaintiff's attorney addressed the sedentary past relevant work positions,

asking the VE, "If the hypothetical individual was going to be – during the work day, they were

going to frequently experience pain and other symptoms severe enough to interfere with their

attention and concentration to perform even simple work tasks. And frequently defined as 34

percent, 66 percent of the work day, would they be able to do their past relevant work?" (Tr. at

114) The VE responded that such a reduction in productivity would be work-preclusive, and

noted that, "[p]articularly with unskilled positions, if a person is having regular absences, even if

it is just one day per month, if that's occurring every month, then that would be work preclusive

if it was a pattern." (Tr. at 115) The VE also confirmed that the number of unscheduled breaks

15

required would reduce productivity by fifteen to twenty percent or more, which would be work-preclusive. (*Id.*)

### D.   ALJ's Findings

Based on the factual evidence and the testimony of Plaintiff and the VE's, the ALJ determined that Plaintiff was not disabled during the relevant time. (Tr. at 19) The ALJ's findings are summarized as follows:[4]

1.   The claimant last met the insured status requirements of the Social Security Act on September 30, 2008.

2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 4, 2007 through his date last insured of September 30, 2008 (20 C.F.R. §§ 404.1571 *et seq.*).

3.   Through the date last insured, the claimant had the following severe impairments:  diabetes mellitus with gastroparesis; and coronary artery disease (CAD) (20 C.F.R. § 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except can occasional [sic] stoop, crouch, crawl, climb ramps/stairs, but no climbing of a ladder, rope, or scaffold; and should avoid concentrated exposure to temperature extremes, odors, dust, gases, and poor ventilation.

6.   Through the date last insured, the claimant was capable of performing past relevant work a [sic] self-employed consultant and office manager.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from October 4, 2007, the alleged onset date, through September 30, 2008, the date last insured (20 C.F.R. § 404.1520(f)).

---

[4] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

(Tr. at 22-29)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as

17

to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51

(internal citations omitted).  Thus, in the context of judicial review under § 405(g), "[a] single

piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a

conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by

other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) –

or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581,

584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for

example, the countervailing evidence consists primarily of the plaintiff's subjective complaints

of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for

rejecting these claims and support his conclusion with medical evidence in the record." *Matullo*

*v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

 "Despite the deference due to administrative decisions in disability benefit cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if

the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225

F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).  "A

district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the

[Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

 Social Security Administration regulations incorporate a sequential evaluation process for

determining whether a claimant is under a disability.  20 C.F.R. § 404.1520.  The ALJ first

considers whether the claimant is currently engaged in substantial gainful activity.  If he is not,

then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1999), which results in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity[5] to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2), (3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. § 404.1527(c)(2).

---

[5] A claimant's residual functional capacity ("RFC") is "that which an individual is able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).

**B.     Whether the ALJ's Decision is Supported by Substantial Evidence**

On November 12, 2013, the ALJ found that Plaintiff was not under a disability within the

meaning of the Act during the relevant time period from the alleged onset date of October 4,

2007, to September 30, 2008. (Tr. at 20)  The ALJ concluded that, despite Plaintiff's severe

impairments of diabetes mellitus with gastroparesis and coronary artery disease, he had the

residual functional capacity to perform sedentary work including his past relevant work as a self-

employed consultant and office manager. (Tr. at 22-28)

Plaintiff contends that: (1) the ALJ erred in finding Plaintiff did not have a severe mental

impairment; (2) the ALJ erred in failing to accord adequate weight to the opinions of Plaintiff's

treating physicians; (3) the ALJ improperly relied upon the VE's testimony, which failed to

consider all of Plaintiff's credibly established limitations. (D.I. 9)

**1.   Plaintiff's mental impairment**

Plaintiff contends that the ALJ improperly found his depression not severe even though

the medical evidence supports a finding that his depression caused more than a minimal effect on

his ability to sustain employment. (D.I. 9 at 14)  Specifically, Plaintiff alleges that the ALJ erred

in failing to include limitations on concentration in the RFC assessment in combination with the

limitations imposed by Plaintiff's gastroparesis. (*Id.* at 16)

To reach her conclusion that Plaintiff does not have any severe mental impairment, the

ALJ assessed functional limitations using the four broad functional areas set out in the disability

regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

First, with respect to activities of daily living, the ALJ found that Plaintiff has a mild limitation.[6]

---

[6] According to the Social Security regulations, "activities of daily living include adaptive
activities such as cleaning, shopping, cooking, taking public transportation, paying bills,

(Tr. at 23) The ALJ based her finding primarily upon Plaintiff's own testimony and statements. Plaintiff testified that he helped care for pets, completes his own personal care, prepares meals, washes dishes, takes out the trash, carries laundry, mows the grass, drives for simple errands, and shops for groceries. (Tr. at 23; 70-72; 306-08) The court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not exhibit marked restriction in activities of daily living.

Second, the ALJ found no limitation in social functioning.[7] Initiating social contact with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). Plaintiff testified that he lived with his wife and enjoyed visiting with his children on a weekly basis and talking to family on the telephone. (Tr. at 47; 309) The court finds there is substantial evidence that supports the ALJ's finding that Plaintiff had no restriction in social functioning.

Third, the ALJ found that Plaintiff has only a mild limitation in the functional area of concentration, persistence, or pace.[8] (Tr. at 23) Plaintiff testified that he had trouble with memory and concentration, but previously reported no difficulty following written or spoken instructions. (Tr. at 63; 310) The court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not exhibit marked restriction in concentration, persistence, or pace.

Fourth, the ALJ found no episodes of decompensation which have been of extended

---

maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

[7] According to the Social Security regulations, "social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." *Id.* at § 12.00(C)(2).

[8] According to the Social Security regulations, "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* at § 12.00(C)(3).

duration.[9] (Tr. at 23) The ALJ noted there is no evidence of any episodes of decompensation or inpatient mental health treatment during the relevant time period. (*Id.*)

Because Plaintiff's medically determinable depression caused no more than "mild" limitations in any of the first three functional areas and no episodes of decompensation which have been of extended duration in the fourth area, the ALJ properly found the condition nonsevere. 20 C.F.R. § 404.1520a(d)(1). The ALJ observed that Plaintiff's treatment for depression remained limited to medication prescribed by his primary care physician, Dr. Moore, and noted that Plaintiff never required inpatient treatment or treatment with a psychiatrist. (Tr. at 22) This is consistent with Dr. Moore's treatment notes, which reveal that Dr. Moore prescribed Celexa and Wellbutrin to treat Plaintiff's depression, but Plaintiff never sought counseling and responded well to the prescribed medication. (Tr. at 723-24; 727-28; 748-56) The ALJ afforded the opinion of state agency psychological consultant Hillel Raclaw, Ph.D., great weight, because she noted that Plaintiff responded positively to the medication prescribed by Dr. Moore. (Tr. at 22)

### 2. Weight of medical opinions and medical evidence

Plaintiff argues that the ALJ failed to properly weigh the medical opinions of Dr. Moore and Dr. Lenhard. (D.I. 9 at 24-28) Plaintiff claims that the ALJ improperly rejected the opinions of Dr. Moore and Dr. Lenhard, despite lab findings, diagnostic evidence, and the consistency of the physicians' records. (*Id.* at 27-28)

Generally, the weight afforded to any medical opinion is dependent on a variety of

---

[9] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace . . . and ordinarily requires increased treatment or a less stressful situation (or a combination of the two)." *Id.* at § 12.00(C)(4).

22

factors, including the degree to which the opinion is supported by relevant evidence and is consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and is consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). The more a treating source presents medical signs and laboratory findings to support his or her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.* An ALJ may only reject a treating physician's assessment outright based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation, or lay opinion. *Morales v. Apfel*, 225 F.3d at 318; *Lyons-Timmons v. Barnhart*, 147 F. App'x 313, 316 (3d Cir. 2005).

Even when the treating source opinion is not afforded controlling weight, it does not follow that the opinion deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). These factors include: (1) the treatment relationship, including the length of the relationship and the nature and extent of the relationship; (2) supportability; (3) consistency; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1527(c)(2)-(6).

Considering this authority against the instant record, the court finds that the ALJ did not err in affording the opinions of Dr. Moore and Dr. Lenhard little weight. (Tr. at 27-28) The ALJ correctly found that the limitations identified in Drs. Moore and Lenhard's diabetes mellitus RFC questionnaires were inconsistent with the limitations described in their own treatment notes. Specifically, Dr. Moore's treatment notes from October 2007 through September 2008 showed

23

an improvement of Plaintiff's symptoms, describing Plaintiff's gastroparesis as stable with only one incident of worsening symptoms in December 2007 related to Plaintiff's consumption of greasy food. (Tr. at 723-28) The ALJ observed that Dr. Moore continued to describe Plaintiff's gastroparesis as stable in notes from Plaintiff's October 2008 appointment. (Tr. at 717) Dr. Lenhard's treatment notes from the relevant time period also suggested an improvement of Plaintiff's symptoms, describing Plaintiff's gastroparesis as sporadic, intermittent, and successfully treated with Phenergan. (Tr. at 28; 815) These notes are inconsistent with his responses to the questionnaire, as Dr. Lenhard did not identify the specific symptoms that would interfere with Plaintiff's attention and concentration and did not complete the questionnaire. (Tr. at 28; 985-87) Plaintiff did not require hospitalization for his symptoms during the relevant period, and his condition was stable enough that he was able to vacation in Jamaica shortly prior to the relevant period. (Tr. at 28; 729) The record demonstrates that Plaintiff's symptoms improved with his medication and dietary restrictions.

Moreover, the opinions of Dr. Moore and Dr. Lenhard regarding Plaintiff's ability to perform low stress jobs are not entitled to controlling weight. The Commissioner's regulations explain that medical source opinions that a claimant is "disabled" or "unable to work" are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20 C.F.R. § 404.1527(d). The court finds that substantial evidence supports the ALJ's decision to assign less than controlling weight to the opinions expressed in the RFC questionnaires by Dr. Moore and Dr. Lenhard, because those opinions are inconsistent with the record as a whole and thus lack consistency and supportability.

### 3.   Sufficiency of the RFC assessment

Finally, Plaintiff argues that the ALJ improperly failed to consider Plaintiff's non-exertional limitations in the hypothetical, including:  (1) episodes of nausea and vomiting; (2) depressive symptoms, which would prevent Plaintiff from being able to perform highly skilled work; and (3) side effects from medication.  (D.I. 9 at 19-21)  Reliance on an expert's answer to a hypothetical question will not constitute substantial evidence unless all credibly established limitations are included; remand is required where the hypothetical question is deficient. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Anderson v. Astrue*, 825 F. Supp. 2d 487, 498 (D. Del. 2011) (citations omitted).  "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).  Third Circuit case law and governing regulations have provided guidance on whether a limitation is "credibly established:"

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response.  Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence.  Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—The ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason.  Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible.  In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

The ALJ appropriately considered Plaintiff's nausea and vomiting in determining which credibly established limitations should be accounted for in the hypothetical and RFC assessment.

25

Specifically, the ALJ indicated that Plaintiff's symptoms were well-controlled with diet and occasional use of medication, and treatment records from the relevant time period did not support Plaintiff's claim of constant nausea and vomiting or indicate any weight loss which would support Plaintiff's testimony. (Tr. at 26)  The ALJ nevertheless accounted for Plaintiff's complaints of stomach pain and nausea triggers by assigning sedentary work with occasional postural limitations. (Tr. at 26-27)  The ALJ appropriately concluded that Plaintiff's complaints of chronic nausea and vomiting were not supported by the medical evidence of record and, consequently, the ALJ was not obligated to include additional limitations in the hypothetical and RFC assessment to account for them. *See Rutherford*, 399 F.3d at 554.

However, the ALJ failed to account for limitations resulting from Plaintiff's medically determinable depression in the hypothetical posed to the VE and the RFC assessment.  While ultimately concluding that Plaintiff's depression was non-severe, the ALJ nonetheless acknowledged that Plaintiff suffered from the "medically determinable mental impairment of depression," which caused a "minimal limitation in [Plaintiff's] ability to perform basic mental work activities." (Tr. at 22)  The ALJ also afforded great weight to the opinion of the state agency psychological consultant, who confirmed the validity of Plaintiff's mental health diagnosis by concluding that Plaintiff's depression was a non-severe impairment responsive to medication. (*Id.*)  Additionally, the ALJ acknowledged that her severity finding at step two of the sequential evaluation process required further explanation at steps four and five of the analysis, including "itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings" to incorporate them in the RFC assessment for purposes of reflecting the degree of limitation found. (Tr. at 23)  However, the ALJ failed to further explain, or even mention, the mild limitations resulting from Plaintiff's depression at

steps four and five of the analysis.  (Tr. at 24-28)

Having found that Plaintiff's non-severe depression was medically supported, and having

acknowledged that there were mild limitations associated therewith, the ALJ had a duty to

address those limitations in the RFC assessment and the hypothetical question posed to the VE.

*See Harmon v. Astrue*, 2012 WL 94617, at *2 (E.D. Pa. Jan. 11, 2012) (citing *Washington v.*

*Astrue*, 2009 WL 855893, at *1 (E.D. Pa. Mar. 31, 2009); *Davis v. Astrue*, 2007 WL 2248830, at

*3-4 (E.D. Pa. July 30, 2007); *Thompson v. Barnhart*, 2006 WL 709795, at *13-15 (E.D. Pa.

Mar. 15, 2006)).  The ALJ's failure to analyze the effects of Plaintiff's mental limitations on

Plaintiff's ability to work at steps four and five was particularly important in view of the ALJ's

conclusion that Plaintiff could perform his skilled past relevant work as a self-employed

consultant and office manager.  Courts have found that "even minimal deficits in these areas of

functioning could impact [a plaintiff's] ability to successfully perform the [skilled] occupation."

*See Harmon*, 2012 WL 94617, at *2.  The ALJ's failure to include all of the limitations she

found to be associated with Plaintiff's medically determinable depression in her RFC assessment

and the hypothetical posed to the VE constitutes legal error.  Consequently, this case must be

remanded to allow the ALJ to reconsider any such limitations stemming from Plaintiff's

medically determinable depression.

Plaintiff also testified that he suffered side effects from his medications which made him

dizzy, lethargic, drowsy, and reduced his ability to concentrate.  (Tr. at 65; 102; 306)  The ALJ

did not consider these side effects in the RFC assessment or incorporate them into the

hypothetical question posed to the VE.  The Commissioner's regulations and Third Circuit

precedent require an ALJ to make findings regarding the effectiveness and side effects of

medications.  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 n.3 (3d Cir. 2000)

(citing *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983)); *see also*

*Dougherty v. Astrue*, 715 F. Supp. 2d 572, 585 (D. Del. 2010); 20 C.F.R. § 404.1529(c)(3)(iv);

SSR 96-7p, 1996 WL 374186.  Under 20 C.F.R. § 404.1529(c)(3)(iv), in determining whether a

claimant is disabled, the Commissioner will consider the type, dosage, effectiveness, and side

effects of any medication the claimant takes or may have taken to alleviate pain or other

symptoms.  Although the ALJ is not required to incorporate limitations relating to the side

effects of Plaintiff's medications if the medical record contains no evidence of physical

limitations resulting from those side effects, *see Burns v. Barnhart*, 312 F.3d 113, 130-31 (3d

Cir. 2002) and *Dougherty v. Astrue*, 715 F. Supp. 2d 572, 585 n.9 (D. Del. 2010), the ALJ is

required to consider those side effects.  In the present case, the ALJ failed to do so, thus

warranting remand.

Plaintiff also contends that substantial evidence does not support the ALJ's determination

that Plaintiff is able to perform his past relevant work as a consultant and office manager.  (D.I. 9

at 21-24)  Having concluded that remand is warranted to give the ALJ an opportunity to include

all credible limitations in the RFC assessment, the court need not reach a determination on

Plaintiff's ability to perform his past relevant work at this time.  The court may conduct such an

analysis once the RFC assessment is no longer deficient.

With respect to Plaintiff's assertion that the ALJ improperly failed to rely upon the

medical vocational guidelines when determining whether work existed that Plaintiff could

perform, the court notes that the medical vocational guidelines apply when the claimant has only

exertional limitations, and do not apply in the present case because Plaintiff also had non-

exertional limitations.  *See Sykes v. Apfel*, 228 F.3d 259, 269 (3d Cir. 2000) ("The regulations do

not purport to establish jobs that exist in the national economy at the various functional levels

when a claimant has a nonexertional impairment.").

## V.   CONCLUSION

For the foregoing reasons, I recommend that the court grant Plaintiff's motion for

summary judgment (D.I. 8) and deny the Commissioner's cross-motion for summary judgment

(D.I. 11). I further recommend that the court reverse the Commissioner's decision and remand

the case to the Commissioner with instructions to:

(1) Consider the limitations associated with Plaintiff's medically determinable mental

impairment of depression in combination with the limitations associated with

Plaintiff's impairments of gastroparesis, diabetes mellitus, and coronary artery

disease;

(2) Determine whether Plaintiff has limitations associated with the side effects of his

medications and, if any, consider such limitations in combination with the limitations

associated with all aforementioned impairments;

(3) Address the foregoing limitations in the hypothetical question posed to the VE; and

(4) Re-assess Plaintiff's RFC and his ability to return to past relevant work.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10)

pages each. The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1

(3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: September  1  , 2016

Sherry R. Fallon
United States Magistrate Judge